IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| JOSEPH J. YURASEK, JR., | : | Case No. 1:13cv150 |
| | : | |
| Plaintiff, | : | Chief Judge Susan J. Dlott |
| | : | |
| v. | : | ORDER GRANTING IN PART AND |
| | : | DENYING IN PART PLAINTIFF'S |
| CROSSMARK, INC., | : | MOTION FOR SUMMARY |
| | : | JUDGMENT (Doc. 23.) |
| Defendant. | : | |
| | : | |

Plaintiff Joseph J. Yurasek, Jr., brings this action against his former employer, Defendant CROSSMARK, Inc. ("Crossmark"), claiming age discrimination and retaliation in connection with his allegedly wrongful termination. Yurasek brings discrimination and retaliation claims under state and federal law. (Doc. 15, Amended Complaint.) Crossmark's Motion for Summary Judgment is currently before the Court.

For the following reasons, Defendant's Motion for Summary Judgment (Doc. 23) is DENIED with respect to Plaintiff's discrimination claim and GRANTED with respect to his claim of retaliation.

I.    BACKGROUND[1]

Crossmark provides sales and marketing services to the grocery industry. One of its primary roles is to act as a liaison between consumer goods manufacturers (Crossmark's clients) and retailers, assisting its clients in getting their products on the retail store shelves and maximizing profitability. Account Executives ("AEs") are Crossmark's front-line employees,

---

[1] Except as otherwise indicated, background facts are drawn from Defendant's proposed Statement of Undisputed Facts (Doc. 23-2, at PageID 113–28) to the extent those facts are admitted in Plaintiff's response thereto (Doc. 36-4, at PageID 1344–81).

responsible for interfacing with clients, analyzing their needs, providing strategic advice, and working to maximize product placement and profitability.

In the late 1990's Crossmark acquired Plaintiff's prior employer, the Pfeister Company, where Plaintiff was employed since 1979. (Yurasek Dep. 35–42, Doc. 35 at PageID 1096–98.) In May of 2003, Plaintiff—then fifty-two years old—was offered and accepted a lateral transfer to Crossmark's Cincinnati office to be an AE on the company's Kroger team. Plaintiff reported directly to Senior Director of Sales, Keith Johnson. Johnson, in turn, was supervised by Tom Rowe, Regional Vice President of the Midwest Division.

Johnson performed yearly evaluations of his employees, rating their performance in several categories by assigning one of the following evaluations: Unsatisfactory, Improvement Required, Consistently Meets, Consistently Exceeds, and Exceptional. For the first nine years, Plaintiff performed well at Crossmark, receiving positive ratings on his annual performance evaluations. From 2004 to 2010, for example, Johnson gave Plaintiff ratings of "Consistently Meets" or "Consistently Exceeds" expectations in every category, with an overall score of "Consistently Meets" expectations.

**A. The Dallas Youth Movement**

According to Plaintiff, on June 1, 2010, Johnson called a meeting with Plaintiff and other AEs to discuss reorganization in Crossmark. (Yurasek Dep. 283–84, Doc. 35 at PageID 1158.) Johnson allegedly announced a new movement out of Crossmark's Dallas office—the "Dallas youth movement"—which Johnson summarized as being "all about the younger people moving up." (*Id.*) Plaintiff claims to have asked Johnson what the movement meant for the Kroger team, to which Johnson replied that "if you're over fifty, you're hosed." (*Id.*, Doc. 35 at PageID

1158.)  At the meeting, Johnson also allegedly told another AE, Shari Wagner, that she was safe because she was under fifty.  (*Id.*)

Yurasek testified that this was one of multiple meetings where age discrimination was discussed.  (*Id.* at 286–87, Doc. 15 at PageID 1159.)  On June 9, 2011, Johnson called the Kroger team to a meeting to convey comments by Crossmark's Corporate Executive Vice President of Business Development, Todd Mitchell, that Crossmark's client development team was not securing new business because the AEs in the field were "too old and tired."  (*Id.* at 287–88, Doc. 35 at PageID 1159.)

### B.  Plaintiff Meets with Crossmark President, John Thompson

Starting in 2011, Crossmark President John Thompson began meeting with Crossmark employees from various levels throughout the organization regarding their opinions on Crossmark's key business initiatives.  Thompson had his assistant randomly select from Crossmark's 30,000-plus employees and on June 13, 2011, after being selected, Plaintiff had a videoconference with Thompson.

Yurasek testified that he brought up concerns about age discrimination during the meeting and asked Thompson if he recognized the overemphasis the company was placing on younger people versus senior executives.  (*Id.* at 268–69, Doc. 35 at PageID 1154.)  He further testified that he complained to Thompson that Crossmark was disproportionately recognizing the accomplishments of young employees with short tenure and ignoring the accomplishments of older workers.  (*Id.* at 270–71, Doc. 35 at PageID 1155.)

3

According to Plaintiff, Thompson asked him to summarize the content of the video conference. (*Id.* at 272, Doc. 35 at PageID 1155.) On July 28, 2011, Plaintiff sent Thompson a follow up letter purporting to summarize their discussion. (*Id.*)

### C. Plaintiff Receives Highest Review in his June 2011 Yearly Review

On June 23, 2011, Plaintiff—then sixty-one years old—received an overall "Consistently Exceeds" rating in his yearly review, his best review in the seven years he had held the position. In the review, Johnson noted that Plaintiff was always willing to work with his clients, who respected and valued his ideas and opinions. Johnson further emphasized Plaintiff's excellent communication with his clients, Kroger, and his co-workers.

### D. Maxi-Canada Claims Plaintiff has a "Defensive Edge"

On February 10, 2012, David Kellogg, Plaintiff's client contact at Maxi-Canada, emailed Johnson and Rowe concerning difficulties in working with Plaintiff. Kellogg claimed that Plaintiff had a "defensive edge" in an email responding to questions regarding the pricing and placement of Maxi-Canada's products in certain stores. Kellogg questioned whether Plaintiff was being proactive in achieving the goal of attaining the optimal price and placement of their products.

Johnson and Rowe discussed Kellogg's email with Plaintiff, encouraging him to consider Kellogg's preferences and to reduce his reliance on email communications so as to avoid misunderstandings regarding tone.

### E. The Chobani Incident

On February 15, 2012, while meeting with a Kroger buyer, Plaintiff called A.J. Mergele, his client contact at Chobani. Plaintiff left him a voicemail message but neglected to end the

4

call, resulting in a portion of his conversation with the Kroger buyer being recorded on Mergele's voicemail. During this conversation, Plaintiff allegedly made disparaging remarks about Mergele. Mergele contacted Johnson after listening to the voicemail and demanded that Crossmark remove Plaintiff from the Chobani account.

Although Johnson testified that he believed that the event was understandable and unlikely to be repeated (Johnson Dep. 180–81, Doc. 28 at PageID 616), he removed Plaintiff from the Chobani account after consulting with Rowe. Neither Johnson nor Rowe claim to have listened to the content of the message. (Rowe Dep. at 101, 103–104, Doc. 32 at Page ID 872, Johnson Dep. 174, Doc. 28 at PageID 614.) Plaintiff, who also has not heard the message, testified that he believed the message included a comment that "A.J. just doesn't get it," referring to issues Plaintiff was having getting Mergele to be customer focused. (Yurasek Dep. 174–75, 185, Doc. 35 at PageID 1131.)

### F. Old Orchard Voices Concerns

On February 17, 2012, Plaintiff's client contact at Old Orchard Brand, Mike Summers, expressed concerns regarding the service received from Plaintiff to Johnson, Rowe, and Tal Riffe, the former Old Orchard AE. Summers complained about Plaintiff's work on a December 2011 presentation, which Summers claimed was not ready until shortly before the presentation; Plaintiff's use of a GPS device while driving to a Kroger store; a comment about Old Orchard executives participating in wine seminars at a dinner; and two distribution issues. Despite the complaints, Summers indicated that "none of the above points are really issues that likely would have turned out differently had [Riffe] been the AE." (Rowe Dep., Ex. 8, Doc. 32-1 at PageID 930–31.) Summers stated that he was hopeful that the situation could be remedied, but cautioned

that his superiors at Old Orchard might consider removing the line from Crossmark if the situation was not remedied.

### G. Plaintiff receives an Employee Counseling Form

On February 20, 2012, Johnson and Rowe issued an employee counseling form to Plaintiff based on "unsatisfactory work performance." Specifically, the document recounted the February 15, 2012 Chobani incident and the February 17, 2012 Old Orchard complaints. Rowe testified that the only issues in Summers's email worthy of discipline were the complaints about Plaintiff's presentation timing and the distribution issues, although he indicated that he did not know if there was anything about Plaintiff performance that caused the distribution issues. (Rowe Dep. at 108–109, 134–35, Doc. 32 at PageID 873–74, 880.) Although Plaintiff had not received a warning previously, the form indicated that it was a final written warning and that "immediate and sustained improvement must be seen" with Plaintiff's remaining accounts. (Yurasek Dep., Ex. 9, Doc. 35-3 at PageID 1258). The form also stated that Plaintiff must be extremely careful of what he says and/or puts in writing regarding clients and customers. (*Id.*)

Plaintiff submitted a response to the warning on March 3, 2012. Therein, Plaintiff acknowledged his mistake regarding the Chobani incident and vowed to be more careful about client correspondence. (*Id.*, Doc. 35-3 at PageID 1261–63.) However, Plaintiff contested each of the Old Orchard complaints, asserting that the complaints were largely misplaced and did not warrant a formal write up of poor performance. Plaintiff nevertheless indicated that he would refocus his efforts and be sensitive to Summers's perceptions.

### H. Problems Continue with Old Orchard and Summers

On March 27, 2012, Summers sent another email to Johnson regarding Plaintiff. Summers indicated that he was losing confidence in Plaintiff's ability to communicate with Kroger and Old Orchard and was frustrated by Plaintiff's failure to comply with Summers's instruction not to reply to all individuals included in emails. Summers further indicated that he believed a change of AE was necessary.

Johnson, however, testified that he did not believe a change was necessary at that time. (Johnson Dep. 206, Doc. 28 at Page ID 622.) According to Johnson, he told Summers that he truly believed and had great faith in Plaintiff. (*Id.*)

On June 13, 2012, Summers sent Johnson another email regarding Plaintiff's copying Summers's management team on email responses. Johnson responded to Summers the following day, indicating "I've got a plan, my review is next Tuesday with Joe and I'm going to tell him then. We will start the process by the end of the next week. I think you will be really pleased." (Johnson Dep., Ex. 16, Doc. 28-1 at PageID 695; Johnson Dep. 209–10, Doc. 28 at PageID 623.) Johnson testified that his correspondence referred to changing the AE on the Old Orchard account. (Johnson Dep. 216, Doc. 28 at PageID 625.)

### I. Plaintiff Receives a "Consistently Meets" Expectations Rating in his Performance Evaluation, a Bonus, and a Raise

On June 19, 2012, Plaintiff received his annual performance review, which measured his job performance from April 1, 2011 through March 31, 2012.[2] Although the evaluation acknowledged that Plaintiff experienced a difficult year with the issues with Chobani, Old

---

[2] The evaluation form specified that the review period was from April 1, 2011 through March 31, 2012. However, as discussed below, the parties disagree as to whether the evaluation encompassed events occurring outside the specified time frame.

7

Orchard, and Maxi-Canada, Johnson gave Plaintiff an overall "Consistently Meets" expectations rating. Rowe—who reviewed Johnson's yearly assessments—disagreed with the rating given the issues with Chobani and Old Orchard, but deferred to Johnson's desire to positively reinforce Plaintiff. Johnson testified that he felt the rating was warranted in light of Plaintiff's overall performance during the time he had worked with Johnson. He also stated that the Chobani incident, albeit serious, "could happen" and that "the Old Orchard thing was kind of something that was ongoing but had not been finalized yet." (Johnson Dep. 92, Doc. 28 at PageID 594.)

Plaintiff also received a 2% bonus—a typical percentage for an AE who was meeting performance expectations—after the employee counseling form, but prior to the review. He also received a raise after the review. (Rowe Dep. 43, 158–59, Doc. 32 at PageID 857, 886; Yurasek Aff. 5, Doc. 36-3 at PageID 1342.) The bonus and raise were discretionary, distributed by Rowe and Johnson based on merit. (Rowe Dep. 43–44, 158, 160–61, Doc. 32 at PageID 857, 886–87; Johnson Dep. 73, Doc. 28 at PageID 590.)

Plaintiff submitted a written response to the performance evaluation. Plaintiff again acknowledged his error concerning the Chobani incident and repeated his concerns about Summers' complaints.

### J. Summers and Kellogg Demand Plaintiff's Removal from the Old Orchard and Maxi-Canada Accounts

On the same day Plaintiff received his performance evaluation, Summers again emailed Johnson concerning the possibility of replacing Plaintiff on the Old Orchard account. In the email, Summers indicated that "the time line of Joe and his replacement came up again" and referenced conversations he had previously had with Johnson regarding a candidate to replace Plaintiff that had not worked out. (Johnson Dep., Ex. 17, Doc. 28-1 at PageID 697.)

8

On June 28, 2012, Summers emailed Johnson again, indicating that he had made the final decision to demand Plaintiff's removal as the AE on the Old Orchard account. Johnson complied with Summers request and assigned the account to another AE, Shari Wagner.

Summers subsequently sent Plaintiff a note congratulating him on his work on the Old Orchard account and thanking him for his work in transitioning the account to Wagner. In the letter, Summers noted the "collective judgment" that the account needed a "fresh set of eyes" and praised Plaintiff for a tenure "always full of introspection, idea generation, and passion." (Johnson Dep., Ex. 19, Doc. 28-1 at PageID 705.) The note also offered Plaintiff a $300 credit to the Cincinnati Orchestra, which Plaintiff declined. (Yurasek Dep. 218–21, Doc. 35 at PageID 1142; *Id.*, Ex. 12, Doc. 35-4 at PageID 1276–77.)

According to Rowe and Johnson, in July of 2012 David Kellogg also requested that a new AE be assigned to the Maxi-Canada account, intimating that if they did not make an account change that the company would lose the line. (Johnson Dep. 104–105, Doc. 28 at PageID 597–98; Rowe Dep. 162–63, Doc. 32 at Page ID 887.)

### K.  Crossmark Terminates Plaintiff

Following Kellogg's call and after discussing the issue with Johnson, Rowe made the decision to terminate Plaintiff. Rowe testified that Crossmark could no longer trust Plaintiff to satisfy his clients and could not continue to pressure the remaining AEs to take over his lines.

On August 8, 2012, Rowe and Johnson requested that Beth Lamb, Cincinnati's office manager, submit a termination request for Plaintiff to Crossmark's Plano, Texas Employee Relations Department for review. After the request was approved, Rowe carried out Plaintiff's employment termination on September 6, 2012.

### L.  Mannheimer Denied Experienced AEs Following Plaintiff's Termination

Ann Mannheimer, Vice President of Market and Sales for Pik-Nik Foods, U.S.A., was pleased with Plaintiff's services as AE.  (Mannheimer Aff. 1, Doc. 36-2 at PageID 1338.)  She indicated that he was by far the most knowledgeable AE she had worked with.  (*Id.*)  After Plaintiff's termination, Mannheimer worked with Wagner, and then Matt Konnos, who she described as a "much younger employee and a very green account executive."  (*Id.* at 2, Doc. 36-2 at PageID 1339.)  On May 1, 2013, Mannheimer called Rowe, who informed her that a 28-year-old AE may be assigned as her new AE.  She expressed her desire to have an experienced and knowledgeable AE assigned, but was informed that it would be difficult to get someone with more experience.  Rowe explained that "we have an aging population in our broker base.  We are trying to hire younger people to get a younger base.  This is a huge issue across the industry.  We missed a generation.  Do not look for this to change as this is part of the business."  (*Id.*)

## II.    SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  All reasonable inferences from the record must be drawn in the light most favorable to the nonmoving party, and the court may grant summary judgment only "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986).  The moving party may support the motion for summary judgment with affidavits or other proof or by exposing the lack of evidence on an issue for which the nonmoving party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).  In responding to a summary judgment

motion, the nonmoving party may not rest upon the pleadings but must go beyond the pleadings and "present affirmative evidence in order to defeat a properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986). The task of the Court is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249.

### III. ANALYSIS

#### A. Discrimination Claims

Yurasek claims that Crossmark terminated him on account of his age in violation of the ADEA, and Ohio Revised Code Chapter 4112. Crossmark moves for summary judgment, arguing that Yurasek cannot prove that Crossmark's reasons for discharging him were pretext for discrimination.

The ADEA makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a). Ohio's anti-discrimination statute, set forth in Ohio Revised Code Chapter 4112, prohibits employment discrimination on the basis of "race, color, religion, sex, national origin, disability, age, or ancestry." Ohio Rev. Code § 4112.02(A). Ohio law parallels the ADEA, and the Court will analyze the federal and state discrimination claims together. *See Whitt v. Lockheed Martin Utility Serv., Inc.*, 209 F. Supp. 2d 787, 792 (S.D. Ohio 2002).

An employee alleging age discrimination can withstand a motion for summary judgment either by presenting direct evidence of discrimination or, using the *McDonnell Douglas* framework set forth below, by presenting circumstantial evidence from which a jury may infer a

11

discriminatory motive underlying the adverse employment action. Yurasek does not claim to have direct evidence of discrimination, and the parties agree that the Court should analyze the evidence on the age discrimination claim pursuant to the *McDonnell Douglas* framework.[3] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

To set forth a prima facie case of discrimination using circumstantial evidence, a plaintiff must establish the four elements of the well-known *McDonnell Douglas* test: 1) that he was a member of a protected class; 2) that he suffered an adverse employment action; 3) that he was qualified for the position; and 4) that he was replaced by someone outside of the protected class or was treated less favorably than a similarly situated individual outside his protected class. *See*, *e.g., Geiger v. Tower Auto.*, 579 F.3d 614, 622–23 (6th Cir. 2009) (referring to the standard established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)); *Johnson v. University of Cincinnati*, 215 F.3d 561, 572–73 (6th Cir. 2000) (same). Crossmark does not argue that Yurasek fails to establish a prima facie case of age discrimination.

Accordingly, the burden of production shifts to Crossmark to provide a legitimate non-discriminatory reason for his termination. Crossmark has done so here. Specifically, Crossmark maintains that Plaintiff was terminated because three of Crossmark's clients demanded that Plaintiff no longer represent them due to the clients' dissatisfaction with Plaintiff's performance.

---

[3] Although the Supreme Court has not definitively decided whether the *McDonnell Douglas* framework applies to ADEA claims and declined to address that question in *Gross v. FBL Financial Services, Inc.*, 557 U.S. 167 (2009), the Sixth Circuit has consistently found "the *McDonnell Douglas* framework useful in analyzing circumstantial evidence of ADEA claims." *Geiger v. Tower Auto.*, 579 F.3d 614, 622 (6th Cir. 2009). In several post-*Gross* opinions, the Sixth Circuit continued to apply the *McDonnell Douglas* framework in ADEA cases on the basis that absent any inconsistent decision of the Supreme Court or an en banc decision of the Sixth Circuit, the Sixth Circuit remains bound by its prior published decisions. *See id.*; *Schoonmaker v. Spartan Graphics Leasing, LLC*, 595 F.3d 261, 264 n.2 (6th Cir. 2010); *Bartlett v. Gates*, 421 F. App'x 485, 489 (6th Cir. 2010); *Johnson v. Franklin Farmers Co-op.*, No. 09-5483, 2010 WL 1994853, at *2 (6th Cir. May 19, 2010); *Johnson v. Interstate Brands Corp.*, 351 F. App'x 36, 39 n.3 (6th Cir. 2009).

Because Crossmark proffered a non-discriminatory rationale for its employment decision, Yurasek, in order to prevail, must rebut Crossmark's argument by introducing evidence of pretext. "A plaintiff will usually demonstrate pretext by showing that the employer's stated reason for the adverse employment action either (1) has no basis in fact, (2) was not the actual reason, or (3) is insufficient to explain the employer's action." *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 393 (6th Cir. 2008). "The three-part test need not be applied rigidly. Rather, '[p]retext is a commonsense inquiry: did the employer fire the employee for the stated reason or not?'" *Blizzard v. Marion Technical College*, 689 F.3d 275, 285 (6th Cir. 2012) (quoting *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 n.4 (6th Cir. 2009)). "[T]he trier of fact may . . . consider the evidence establishing the plaintiff's prima facie case and inferences properly drawn therefrom . . . on the issue of whether the defendant's explanation is pretextual." *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 143 (2000) (internal quotation marks omitted).

Yurasek advances several reasons for finding that Crossmark's proffered reason for terminating Plaintiff was pretextual. First, Plaintiff claims that the timeline leading up to his termination demonstrates that he was not terminated for problems relating to Crossmark's clients, as Defendant claims. Specifically, Plaintiff contends that the reasons articulated for his termination arose months before he was fired and prior to his performance evaluation indicating that he consistently meets Defendant's expectations. Plaintiff points to the fact that the Chobani incident and his removal from that account, Summers's February 17, 2012 complaints about the presentation and distribution issues, and Kellogg's email regarding Plaintiff's "defensive edge" all occurred before Plaintiff received his final written warning and satisfactory job evaluation.

13

Kellogg's complaint was not included in the written warning, which Plaintiff contends would permit a jury to draw the inference that Kellogg's complaint was not worthy of discipline, much less termination. In addition, Plaintiff notes that the issues predating his final written warning, as well as Summers's subsequent request for an AE change on the Old Orchard account, all occurred prior to the review period identified in Plaintiff's satisfactory performance evaluation and his discretionary, merit-based raise.

Plaintiff further contends that because his June 19, 2012 performance evaluation referenced incidents outside the purported review period (April 1, 2011 through March 31, 2012), a jury could find that his "consistently meets" expectations evaluation encompassed his performance up to the date of the review. This would include consideration of the fact that Johnson informed Summers that he already had a plan in place to assign a new AE to the Old Orchard account on June 14, 2012, prior to the performance review and before Plaintiff received a discretionary raise. Plaintiff testified that he was aware that a change would be made as early as May of 2012.

Second, Plaintiff contends that a genuine issue of material fact exists as to whether Kellogg actually demanded Plaintiff's removal from the Maxi-Canada account. Plaintiff claims this never occurred, arguing that there is no documentation of the request. Plaintiff further notes that Rowe discussed the client issues leading up to Plaintiff's termination with Todd Mitchell. (Mitchell Dep. 18–22, Doc. 30 at Page ID 787–88.) Although Rowe specifically reported the issues with Old Orchard and Chobani in discussing Plaintiff's situation, Mitchell testified that he does not recall Maxi-Canada being raised in connection with Plaintiff's termination. (*Id.* at 21, 28–29, Doc. 36 at PageID 788, 789–90.)

Plaintiff also contends that the facts in this case permit a jury to reasonably conclude that it was not abnormal for AEs to be moved to and from Crossmark's accounts.  Plaintiff points to the testimony of Todd Mitchell, who indicated that changing an AE due to an unhappy client is "something that happens with frequency."  (*Id.* at 29–32, Doc. 30 at PageID 790.)  Thompson similarly testified that Crossmark moved account executives around "all the time."  (Thompson Dep. 52, Doc. 34 at PageID 52.)  Johnson also indicated that AEs are sometimes reassigned due to the client wanting a fresh AE or dissatisfaction with things completely outside the AE's control or performance.  (Johnson Dep. 51, Doc. 28 at PageID 584.)

Finally, Plaintiff claims that the age-based comments by Defendant's senior management permit a fact finder to reasonably conclude that the statements evince discriminatory intent.  Specifically, Plaintiff points to Johnson's indication that members of the Kroger team older than fifty were "hosed," Todd Mitchell's comment that Crossmark's client development team was not securing new business because the AEs in the field were "too old and tired," and Rowe's comments to Mannheimer indicating that Crossmark had an aging problem in its broker base and was trying to hire younger employees.

Defendant contends that such comments are insufficient to demonstrate animus.  According to Defendant, Mitchell's comment that the AEs in the field were "too old and tired" to secure new business fails to demonstrate discriminatory animus because Mitchell was not a decision-maker with regard to Plaintiff's termination.  Defendant further contends that Johnson's and Rowe's statements were unrelated to the decision to terminate Plaintiff.

Defendant correctly observes that statements by non-decision-makers or decision-makers unrelated to the decisional process are insufficient to demonstrate animus.  *See Bush v.*

15

*Dictaphone Corp.*, 161 F.3d 363, 369 (6th Cir. 1998) (quoting *Price v. Waterhouse v. Hopkins*, 490 U.S. 228, 277 (1989)). However, the Sixth Circuit has held that "remarks by those who did not independently have the authority or did not directly exercise their authority to fire the plaintiff, but who nevertheless played a meaningful role in the decision to terminate the plaintiff, were relevant." *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 354–55 (6th Cir. 1998) (citing *Abrams v. Lightolier Inc.,* 50 F.3d 1204, 1214 (3d Cir. 1995) (age-related statements of corporate vice president who may have "played a role" in the decision to terminate the plaintiff were relevant and could "properly be used to build a circumstantial case of discrimination")). The record in this case includes evidence that Mitchell directly participated in discussions with Rowe concerning Plaintiff's termination. (Mitchell Dep. 18–22, Doc. 30 at Page ID 787–88.) Accordingly the Court rejects Defendant's contention that Mitchell's comment is insufficient to demonstrate animus.

Defendant's argument regarding Johnson's and Rowe's remarks is also unavailing. As noted above, Defendant claims that their comments are unrelated to Plaintiff's termination and, therefore, cannot satisfy Plaintiff's burden of showing animus. While "a direct nexus between the allegedly discriminatory remarks and the challenged employment action affects the remark's probative value, the absence of a direct nexus does not necessarily render a discriminatory remark irrelevant." *Id.* at 355 (citing *La Pointe v. United Autoworkers Local 600*, 8 F.3d 376, 380 (6th Cir. 1993) (supervisor's ageist remarks about "oldtimers" constitute direct evidence of age discrimination even though the comments were not specifically about or directed to the plaintiff)). When assessing the relevance of a remark where the plaintiff cites multiple discriminatory comments or other evidence of pretext, the Sixth Circuit has instructed that a

16

district court should not view each remark in isolation, but must be mindful that "the remarks buttress one another as well as any other pretextual evidence supporting an inference of discriminatory animus." *Id.* Viewing the alleged discriminatory remarks in the light most favorable to Plaintiff and in conjunction with the other evidence of pretext, the Court is satisfied that the remarks reasonably support an inference of animus.

While far from dispositive, when viewed most favorably to Plaintiff, the above evidence is sufficient to support a reasonable conclusion that the reasons articulated in support of Plaintiff's termination did not actually motivate the decision or were not based in fact. Although Defendant maintains Plaintiff was terminated because three clients demanded new AEs on their accounts, Plaintiff has proffered evidence that two of the clients requested the change prior to Plaintiff receiving a satisfactory performance evaluation and merit-based raise, that changes to AE assignment on an account is not atypical (and presumably not cause for termination), and that members of Defendant's senior management—including Plaintiff's direct supervisor—made comments that would permit a reasonable inference of discriminatory animus. Furthermore, a disputed question of fact remains as to whether Kellogg requested Plaintiff's removal from the Maxi-Canada account. Viewing the evidence in the light most favorable to Plaintiff, a reasonable jury could conclude that Defendant's reasons for terminating Plaintiff were pretextual and that Plaintiff would not have been fired but for age discrimination.

For these reasons, Defendant's Motion for Summary Judgment as to Plaintiff's discrimination claims is DENIED.

### B. Retaliation Claims

Yurasek also claims that Crossmark retaliated against him in violation of the ADEA and Ohio Revised Code Chapter 4112. According to Plaintiff, he was terminated in retaliation for complaining to Crossmark President John Thompson about age discrimination and unequal treatment between younger and older employees.

To establish a prima facie case of retaliation under federal or Ohio law, Plaintiff must demonstrate that (1) he engaged in protected activity, (2) Defendant was aware that Plaintiff engaged in protected activity, (3) Defendant took an adverse employment action against Plaintiff, and (4) there is a causal connection between the protected activity and the adverse employment action. *Blizzard v. Marion Technical College*, 698 F.3d 275, 288 (6th Cir. 2012) (quoting *Greer-Burger v. Temesi*, 879 N.E.2d 174, 180 (2007) and *Imwalle v. Reliance Med. Prods., Inc.*, 515 F.3d 531, 544 (6th Cir. 2008)). Similar to age discrimination claims, the burden of production shifts to Defendant to offer a non-discriminatory reason for the adverse employment action once Plaintiff establishes a prima facie case of retaliation. *Ladd v. Grand Trunk W. R.R., Inc.*, 552 F.3d 495, 502 (6th Cir. 2009). If Defendant carries its burden, Plaintiff must then "demonstrate that the proffered reason was mere pretext." *Id.*

In this case, Plaintiff fails to establish a prima facie case of retaliation. Plaintiff alleges that he was fired in retaliation for his June 2011 videoconference discussions with Crossmark's President, John Thompson. However, Plaintiff presents no evidence that Rowe and Johnson knew of the conversation or that a causal connection exists between it and his termination. The only evidence before the Court is Rowe's and Johnson's testimony that they were not aware of the conversation (Johnson Dep. 228, Doc. 28 at PageID 628; Rowe Decl. 5, Doc. 23-5 at PageID

18

507) and Thompson's testimony that he had no involvement with Plaintiff's termination and did not discuss the content of the videoconference with Plaintiff's supervisors. (Thompson Dep. 17–18, 46–47, Doc. 34 at PageID 1053, 1060.)

The Court is also not persuaded that a jury could reasonably infer that Thompson addressed Plaintiff's complaints with his supervisors, as Plaintiff argues. Plaintiff cites to *Polk v. Yellow Freight Sys., Inc.*, 876 F.2d 527 (6th Cir. 1989), and *Wind v. Walgreen Co.,* No. 10-cv-94, 2011 U.S. Dist. LEXIS 154972, at *1 (S.D. Ohio June 22, 2011), in support of his claim that such an inference is warranted in this case. However, these cases are distinguishable from the instant action because in both cases the plaintiff presented evidence that the decision makers knew of the protected activity. In *Polk*, the plaintiff presented evidence that her supervisor stated "I know where you've been," referring to the plaintiff's visit to the Michigan Department of Civil Rights to inquire about possible rights violations.[4] *Polk*, 876 F.2d at 531. Similarly, in *Wind*, this Court determined that a jury could reasonably infer that a former manager who made negative comments regarding the plaintiff's FMLA leave impacted the decision of a subsequent manager who fired the plaintiff. The inference in that case was warranted because the plaintiff presented evidence that the two managers discussed the plaintiff's situation. *Wind*, 2011 U.S. Dist. LEXIS 154972 at *25. Absent any evidence that Johnson or Rowe were aware of the protected activity or that Thompson influenced their decision, Plaintiff fails to establish a prima facie case of retaliation.

---

[4] The Court also determined that the temporal proximity between the protected activity and the plaintiff's termination—the plaintiff was fired the day after her visit to the civil rights department—permitted a reasonable inference of a causal connection. *Polk*, 876 F.2d at 531. The timing between Plaintiff's June 2011 discussion with Thompson and his September 5, 2012 termination does not permit such an inference. *See Blizzard*, 689 F.3d at 289 (finding that a separation of more than a year between the protected activity and termination does not raise the inference that the protected activity was the likely reason for the adverse action).

The Court therefore GRANTS Defendant summary judgment on Plaintiff's retaliation claim.

## IV. CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment (Doc. 23) is **GRANTED IN PART** and **DENIED IN PART**. The Court grants summary judgment to the Defendant on Plaintiff's claims for retaliation. Plaintiff's discrimination claims remain for resolution.

IT IS SO ORDERED.

                                              S/Susan J. Dlott_____
                                              Chief Judge Susan J. Dlott
                                              United States District Court